UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
KERI HAUFF,

                      Plaintiff,

             - against -

STATE UNIVERSITY OF NEW YORK,
FARMINGDALE STATE COLLEGE and MARVIN
FISCHER, in his individual and official capacity,

                      Defendants.
-------------------------------------------------------------------x

Case No. 2:18-cv-07256

**COMPLAINT**

Jury Trial Demanded

Plaintiff Keri Hauff complaining of the above-named Defendants by her attorneys, Fenley LLP, respectfully alleges as follows:

## NATURE OF THE CLAIMS

1. This is a civil action by Plaintiff seeking monetary damages, to redress Defendants' unlawful employment practices and other unlawful conduct, including the unlawful harassment of Plaintiff by Defendant Marvin Fischer ("Fischer" or "Defendant Fischer") in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX") and the New York State Human Rights Law, New York Executive Law §§ 290 *et seq.* ("NYSHRL").

2. Defendant Fischer, the former Chief of the University Police Department ("UPD") for Farmingdale State College (the "College" or "Defendant College"), engaged in a continuous and pervasive campaign of sexual harassment against Plaintiff during her employment as a police officer and then investigator with the UPD at the College from at least 2009 until August of 2018.

3. Defendant Fischer's harassment created a hostile work environment which Plaintiff endured for at least nine years despite formal complaints to the College's

administration, knowledge by Daniel Daugherty ("Daugherty") the Deputy Chief of Police and the second-highest ranking law enforcement official on campus, informal complaints to the College's Title IX Coordinator, Dr. Veronica Henry, and almost universal knowledge that Defendant Fischer was engaging in harassing behavior within the UPD.

4. Upon information and belief, Dr. Henry, the Title IX Coordinator, the College official tasked with maintaining compliance with the requirements of Title IX, purposefully and knowingly disposed of information submitted to her office by Plaintiff alleging Defendant Fischer's ongoing sexual harassment.

5. Numerous high-ranking College officials and staff knew or had reason to know of Defendant Fischer's sexual harassment of Plaintiff and failed to take any action to stop it.

6. Defendants conduct was knowing, malicious, willful and wanton and/or showed deliberate indifference towards Plaintiff, which caused and continues to cause Plaintiff to suffer severe mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) as the action involves federal questions regarding the deprivation of Plaintiff's rights under Title IX. Pendant jurisdiction of Plaintiff's state law claims exists pursuant to 28 U.S.C. § 1367(a).

8. Venue is properly laid within the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b), as Plaintiff's claims arise in the Eastern District of New York and Defendant College, is located wholly within the District, and Defendant Fischer resides within the boundaries of the Eastern District of New York.

## PARTIES

9. Plaintiff is a citizen of the United States and at all times relevant hereto resided in the County of Suffolk, State of New York. At all relevant times Plaintiff worked for the UPD and met the definition of employee under all applicable statutes.

10. Defendant State University of New York ("SUNY") is a system of public institutions and is, upon information and belief, responsible for the enrollment of over 400,000 students and the employment of 80,000 persons. Upon information and belief, SUNY is the recipient of local, state and federal funding.

11. Defendant College is a college within the SUNY system. Upon information and belief, the College is the recipient of local, state and federal funding.

12. Upon information and belief, SUNY oversees the New York State University Police which operates the UPD at Farmingdale State College.

13. Defendant Fischer was the Chief of the UPD at all relevant times herein. He resides in Suffolk County. Fischer is being sued in his individual and official capacity.

## FACTUAL ALLEGATIONS

**Joining UPD and Facing Harassment From Fischer**

14. Plaintiff began her employment with the UPD as a police officer in or about September 2005 when she was 24 years old.

15. Plaintiff was first harassed by Fischer during her time in the police academy. For example, during the heat of a July day in 2005 as the cadets, including Plaintiff, were performing running exercises at SUNY Old Westbury, Fischer pulled Plaintiff aside and said "you can sit in my car with AC on."

16. This was the beginning of a campaign of sexual harassment perpetrated by Fischer, the Chief of Police, against Plaintiff.

17. As one of only a few women in the University Police system and the only female officer at the College for many years Plaintiff believed that she had to fit in and did not want to complain about behaviors she knew were incorrect.

18. Almost immediately upon becoming an officer in March of 2006 Plaintiff became a favorite of Fischer's. This unwanted attention was based on Plaintiff being an attractive female and this was well-known within the UPD.

19. Being a 24-year old rookie officer on an all-male police force Plaintiff tolerated inappropriate harassing behavior from Fischer in her first years of employment.

20. In or about 2009, after four years as police officer at the UPD, Plaintiff came to realization that her work environment was not normal.

21. In addition to being singled out by Fisher as the only woman on the force, Plaintiff was subject to sexual comments about her looks and gender, sexual innuendo,

4

ogling and unwanted touching.

22. It was no secret that Plaintiff was Fischer's favorite at the UPD and he would routinely say things like "I like you" and that "he had his eye on her."

23. A specific example occurred during the 2009 U.S. Open Golf Tournament at Bethpage State Park which the UPD worked. Fischer told Plaintiff "you don't have to work a post drive around with me."

24. Plaintiff acquiesced to this and similar requests because Fischer was the Chief and because she was one of only a few women on the force she felt compelled to comply.

25. By May 2010 Plaintiff had had enough. She confronted Fischer telling him that she felt like he was harassing her and questioned whether this was the right job for her.

26. In July 2010, Plaintiff took steps to start another career, enrolling at Sanford Brown's cardiac sonography program. She attended school during the day and then worked evening shifts at UPD beginning at 2:45 pm.

27. While enrolled in the cardiac sonography program Fischer's harassment of Plaintiff decreased.

28. In July of 2011, Plaintiff dropped out of the Sanford Brown program because the externship portion, a full-time nonpaying commitment, would have forced her to quit her UPD job and not earn any income.

29. Shortly thereafter, when Fischer learned that Plaintiff had abandoned her plans to leave the UPD he offered to get her a "plain clothes" job as the Accreditation

5

Co-Manager. And he did.

30. In this role, Plaintiff would manage the UPD's effort to apply for and obtain state sanctioned accreditation of the UPD as an accredited law enforcement agency.

31. Plaintiff obtained the accreditation certification on August 17, 2011 and began working in the unofficial title as Accreditation Co-Manager, remaining a police officer in rank.

32. The other accreditation Co-Manager was Investigator Daniel Daugherty before he was promoted to Deputy Chief.

33. Around the same time, September of 2012, Plaintiff was married to her husband John Hauff.

34. This new Co-Manager role involved moving workspaces. Plaintiff and Daugherty shared a conference room one office away from Fischer office in the UPD. Plaintiff would the spend the majority of her 8-hour shift working from this workspace.

35. Almost immediately upon moving to this space Fischer would visit and approach Plaintiff standing uncomfortably close to Plaintiff for no reason whatsoever, making comments and jokes of a sexual nature, ogling or leering and touching of Plaintiff's back and hands. Daugherty was a witness to this behavior by Fischer.

36. That Plaintiff was now working closer with Fischer the harassing behavior increased similar to before her enrollment at Sanford Brown. Plaintiff was subject to harassing behavior at least 2-3 times per week. This went on for months.

37. This was occurring when Plaintiff was pregnant with her first child.

6

38. Being treated this way made Plaintiff uncomfortable and apprehensive at work, feeling like she had to always keep her guard up or she would be harassed more.

39. In September 2013, Plaintiff took maternity leave for the birth of her daughter.

40. Upon returning from maternity leave in January 2014, Plaintiff again took up her work as Accreditation Co-Manager and was subject to the constant verbal and near physical harassment from Fischer.

41. Fischer's harassment of Plaintiff continued unabated.

**The September 2, 2015 Slap**

42. The years of harassment by Fisher would reach a crescendo in an event occurring September 2, 2015.

43. That day, Plaintiff was in Fischer's office with Daugherty reporting that she had just solved a nagging administrative issue related to the TraCS program which allows electronic access of tickets and accident reports within police patrol car.

44. Plaintiff had a large folder in her arms as she explained how she cured the problem and then went to replace the folder in a drawer cabinet located in Fischer's office. As she bent slightly at the waist to place the folder in the drawer Fischer slapped her buttocks with his hand and said "I bet your husband doesn't even do that."

45. Plaintiff left the room horrified but retuned approximately 10 minutes later asserting that that can "never happen to again" to which Fischer responded "duly noted."

46. In the days immediately after this incident, in what now appears to be a perverse apology, Fischer secured Plaintiff a place on the College's President Search

7

Committee. Plaintiff learned of the appointment while in Fischer's office, in the days after the "slap," as he handed her the phone with Dr. Patricia Hill Williams, Chair of the Presidential Search Committed, on the line who advised Plaintiff that she had been added to the search committee.

47. On September 10, 2015, Plaintiff received confirmation by email that she had been added to the Presidential Search Committee.

48. In any event, after conferring with her husband, on September 8, 2015 Plaintiff chose to file a formal complaint with the College's Title IX coordinator, Dr. Henry.

49. Plaintiff went to Dr. Henry and was obviously upset. Despite this Dr. Henry required that the Title IX complaint packet be completed immediately in her office.

50. And even though Plaintiff marked the box for a formal complaint, Dr. Henry steered Plaintiff away from that process influencing Plaintiff to solve the matter through an informal resolution.

51. Dr. Henry mislead Plaintiff to believe that the formal process would be lengthy and that all that was required was an apology from Fischer. This advice was inconsistent with the State of New York Discrimination Complaint Procedure (the "Complaint Procedure").

52. That procedure requires formal harassment complaints to be investigated and adjudicated in approximately 30 days as follows: within seven days a tripartite panel chosen to investigate, 15 days for the panel to produce Finding and Recommendations

and an additional 10 days for President to adopt findings or take other action.

53. In any case, an informal process was commenced and on September 16, 2015 a Memorandum Resolution was agreed to effectively banning further communication between Plaintiff and Fischer (the "2015 Agreement").

54. Fischer admitted to slapping Plaintiff's buttocks describing the act as "an attempt to have some levity in an extremely busy day and break up what I perceived to be stress," in a letter to Dr. Henry dated September 11, 2015.

55. And Daugherty admitted to observing the slap and hearing the comment about Plaintiff's husband afterward in a letter to Dr. Henry dated September 8, 2015.

56. In the days following the slapping incident Plaintiff met with a campus counselor, Dr. Jill Bandura of Campus Mental Health Services. Dr. Bandura referred Plaintiff to an off-campus doctor to which she never visited due to scheduling conflicts.

57. In addition to the communication ban, a further step to separate Plaintiff from Fischer was to move her workspace from the conference room near Fischer's office.

58. Initially, it was proposed to move Plaintiff to an entirely separate building on campus. But after Plaintiff's objections she was provided space in Daugherty's office which the two shared.

59. With the communication ban in place, Plaintiff for the first time in her time at UPD was free from Fischer's harassment.

60. Practically, however, the communication ban posed problematic on a day-to-day-day basis and proved inefficient.

61. As a result, on January 14, 2016, Plaintiff and Fischer agreed to lift the

9

ban but the extent of their contact was to be "conducted [] in a professional/business related manner only; no personal information shall be asked or inclinations perceived at any time."

**Plaintiff's Promotion to Investigator**

62. In April of 2016, Plaintiff went on maternity leave with her second daughter and was promoted to Investigator.

63. During this time, Daugherty, now the Deputy Chief, moved into Fischer's office, and the conference room was redone, with new carpet, painted, new furniture installed and that became Fischer's new office. When Plaintiff retuned from maternity leaved she remained in what was Daugherty's former office.

64. With additional duties as an investigator Plaintiff was required to confer with Fischer more, specifically because all arrests, which the investigator approves, required coordinator with Fischer.

65. And as the contact between Plaintiff and Fischer increased so did the harassment.

66. Because Fischer had already touched Plaintiff inappropriately she worried every day whether Fischer would touch her inappropriately again.

**Fischer's Harassment Increases in 2017**

67. As 2016 turned into 2017, Plaintiff began to keep a journal of the most egregious incidents.

68. Fischer would often utter sexually harassing comments to Plaintiff prefaced by qualifiers like "can I say this without getting in trouble" or "I am probably

10

going to get in trouble for saying this, but… ."

69. In early 2017, Fisher asked Plaintiff: "Am I allowed to put my picture back up now?" Fischer was referring to a photo of Plaintiff with two other female UPD officers which was displayed on his desk at UPD prior to the September 2015 communication ban.

70. In another incident, in the presence of Plaintiff, Fischer referred to a female witness' breast size and used his hands to emphasize large breasts.

71. Moreover, Fischer would instruct female officers and staff to use "what they have to get what they want" in the presence of Plaintiff.

72. On July 20, 2017, Plaintiff was in Daugherty office reviewing a work-related issue displayed on the computer screen on Daugherty's desk. Fischer appeared in the room and sat on the edge of the desk uncomfortably close to Plaintiff, almost touching her with his upper legs and thighs. Having been the victim of his unwanted touching on prior occasions, Plaintiff turned away as best she could in light of the close quarters of Daugherty's office. As this was occurring, Plaintiff's radio, secured to her left hip made a noise and Fischer reached toward and grabbed it.

73. After Fischer left, Plaintiff was visibly upset and Daugherty asked "are you ok?"

74. At one point during her tenure, Daugherty said to Plaintiff "all you ever wanted to do was come to work and do your job, but instead you have to deal with him [Fischer]."

75. The next day, July 21, 2017, Fischer, in a common area of the UPD, told

11

his secretary to "go back to my office so you can hear [a female officer] orgasm" after that officer received her new taser holster.

76. On September 12, 2017, Plaintiff was walking to Campus Center with Daugherty when they encountered Fischer who inquired about the Plaintiff's daughter.

77. This was a direct violation of the 2015 Memorandum and January 2016 amendment thereto.

78. Based on all of these incidents, on September 15, 2017, Plaintiff visited Dr. Henry and requested that her journal entries be made a part of the complaint file against Fischer. Dr. Henry's secretary Bernice Bradshaw stamped the documents received and placed them in the complaint file.

79. Plaintiff assumed there would be follow-up investigation from the Title IX office given the September 2015 complaint and resolution. However, no follow-up investigation ever came, and Plaintiff's complaints about Fischer's ongoing sexual harassment were ignored.

80. But like before, Plaintiff had few options. She needed her job to help support her family and remained in her position facing the harassment of Fischer while the College had actual notice, both through its employees and by a direct complaint by Plaintiff to the Colleges' Title IX Coordinator that the harassment had not stopped.

81. On March 28, 2018, in a disagreement about evidence bags Fischer badgered Plaintiff about being correct on the issue and waived his hand as if to hit her, and then waved his fist at her.

82. On April 24, 2018, Plaintiff received an invitation to attend training

12

related to Title IX, the Violence Against Women Act and the Clery Act from Fischer. Plaintiff was apprehensive to attend being that Fischer would too be in attendance. Of her attendance Fischer noted "there's a piece of paper in Dr. Henry's desk preventing us from going together." This was an obvious reference to the September 2015 Agreement.

83. On August 3, 2018, Plaintiff was in Fischer's office with Daugherty discussing a work-related matter. After Daugherty left and the conversation between Fischer and Plaintiff ended, he told her "Ok, go on and get your cute little ass outta here."

84. Four days later, on August 7, 2018, as Plaintiff was walking back to her office she observed Fisher at a copy machine. Fischer blocked the path, looked Plaintiff up and down and said "you look really really good today, but that's beside the point." Fischer then stumbled backwards, closed his eyes swayed back and forth on his feet.

85. Plaintiff couldn't wait any longer for the College, her colleagues and coworkers, or the Title IX office to protect her. On August 14, 2018, she filed another complaint with the Colleges' Title IX coordinator, Frank Rampello, who had replaced Dr. Henry.

86. Plaintiff referenced the documents she had submitted to Dr. Henry on September 15, 2017, and Mr. Rampello immediately requested that the file be retrieved so that those documents would be reviewed. Upon review of the file, the documents Plaintiff submitted on September 15, 2017 were not included. Ms. Bradsaw was perplexed having herself confirming that she received the documents and placed them in the file.

87. Upon information and belief, Dr. Henry purposely removed the documents

13

to protect Fischer.  In fact, Dr. Henry relied on Fischer, who in turn relied on Plaintiff, to complete her tasks as the Title IX coordinator.

88. In any event, Mr. Rampello accepted Plaintiff's August 14, 2018 complaint and quickly requested that Plaintiff and Fisher nominate tripartite panel members (the "Panel") pursuant to the Complaint Procedure.

89. The Panel was convened and proceeded to investigate the complaint, including interviewing, Plaintiff, Fischer and seven witnesses identified by Plaintiff. Fischer did not offer any witnesses.

90. On September 12, 2018 the Panel issued a Summary of Actions and Findings.   The Panel substantiated the complaint.

91. None of the seven witnesses, the Panel found, "expressed doubt about the accuracy of Detective Hauff's report about the recent incidents on 8/3/2018 and 8/7/2018 and several of them cited general behavior by Chef Fischer that was consistent with the details reported by Detective Hauff."

92. The report continues "[b]ased on available documentation, and statements by witnesses, the members of the Tripartite Panel conclude that Chief Fischer has failed to abide by the stipulations in the [September 16, 2015] agreement."

93. The Panel recommended that "Chief Fischer not be allowed to return to the campus in any capacity."

94. On September 24, 2018, The College's President, Dr. John S. Nadar, adopted the Panel's findings and required that Fischer separate from service accepting his irrevocable letter of resignation.

95. Notwithstanding that Fischer was forced to resign for sexually harassing Plaintiff, Dr. Nader, in a campus-wide email dated September 24, 2018, wished Fischer well, stating as follows: "Marvin Fischer who has retired after 42 years of service to the College. I know the campus community joins me in wishing Chief Fischer good luck on his retirement."

96. And Fischer has be allowed to return to campus on more than one occasion since his separation from service.

97. Daugherty was named interim chief upon Fischer's separation from service.

98. Fischer's harassment of Plaintiff was not stopped until she complained in September of 2015 despite numerous College employees, including the Deputy Chief of Police, having actual knowledge of the harassment.

99. And even after the 2015 Agreement, Fischer continued to sexually harass Plaintiff with actual knowledge by the Deputy Chief of Police, Daugherty, the Title IX coordination, Dr. Henry, and at least six other employees within the UPD.

100. It was not until Plaintiff complained again on August 14, 2018 that Fischer was prevented from harassing her.

101. Fischer's pervasive and severe harassment altered the conditions of Plaintiff's workplace creating a hostile environment and became a condition of her continued employment at the UPD.

102. Fischer's harassing conduct toward Plaintiff was severe and pervasive enough to create a work environment that a reasonable person would consider

15

Case 2:18-cv-07256-DRH-ARL Document 1 Filed 12/20/18 Page 16 of 20 PageID #: 40

intimidating, hostile or abusive.

103. The failure to prevent the harassment and cure the hostile work environment while having actual knowledge of its occurrence is tantamount to deliberate indifference.

**Plaintiff's Record of Exemplary Performance and Sexual Assault Training**

104. Despite the harassment by Fischer throughout her career Plaintiff has achieved an exemplary record of service with the UPD.

105. In May of 2010 she received the State University Police Chief's Association Professionalism Award, May 2010. She received the same award again in 2018.

106. Also in 2010, she was given the Nassau County Municipal Police Chief's Association Distinguished Service Award.

107. In April 2017, she received SUNY Chancellor's Award for Excellence in Classified Service, April 2017

108. Plaintiff contemplating refusing these awards to avoid the having to attend an event where Fischer would also be in attendance.

109. And the UPD held Plaintiff out as a campus spokesperson against sexual assault and misconduct. Plaintiff appears in a safety video concerning sexual assault awareness on campus.

110. Plaintiff also hold dozens of professional certifications many related to sexual assault and/or sexual misconduct.

16

### AS AND FOR A FIRST CAUSE OF ACTION
### (Sexual Harassment/Hostile Workplace in Violation of Title IX)

111.   Plaintiff repeats and realleges each and every allegation in paragraphs 1 through "110" as if fully set forth herein.

112.   Defendants SUNY and the College have discriminated against Plaintiff on the basis of her sex in violation of Title IX by creating, fostering, condoning, accepting, ratifying and/or otherwise exhibiting deliberate indifference to remedy a hostile work environment that included, among other things, a severe and pervasive harassment of Plaintiff by Fischer.

113.   As a direct and proximate result of Defendants SUNY and the College's unlawful discriminatory conduct in violation of Title IX, Plaintiff has suffered and continues to suffer server mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

114.   Defendant SUNY and the College's unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title IX for which Plaintiff is entitled to an award of punitive damages.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Aiding and Abetting Violations of Title IX)

115.   Plaintiff repeats and realleges each and every allegation in paragraphs 1 through "114" as if fully set forth herein.

116.   Defendant Fischer knowingly and recklessly aided and abetted the

unlawful employment practices, discrimination, harassment against plaintiffs in violation of Title IX.

117. As a direct and proximate result, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Sexual Harassment/Hostile Workplace in Violation of NYSHRL)

118. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through "117" as if fully set forth herein.

119. Defendants SUNY and the College have discriminated against Plaintiff on the basis of her sex violation of the NYSHRL by, *inter alia*, by denying her equal terms and conditions of employment, including, but not limited to, subjecting Plaintiff to disparate working conditions and denying her the opportunity to work in an employment setting free of unlawful harassment.

120. Defendants SUNY and the College discriminated against Plaintiff on the basis of her sex in violation of the NYSHRL by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive discrimination and harassment committed against Plaintiff.

121. As a direct and proximate result of SUNY and the College's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues

18

to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Aiding and Abetting Violations of the NYSHRL)

122. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through "121" as if fully set forth herein.

123. Defendant Fischer knowingly and recklessly aided and abetted the unlawful employment practices, discrimination, harassment against plaintiffs in violation of the NYSHRL.

124. As a direct and proximate result, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain, for which she is entitled to an award of monetary damages and other relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enters judgment in her favor and against Defendants containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United State and the State of New York;

B. An award of damages in an amount to be determined at trial, plus pre-

judgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

      C.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

      D.      An award of punitive damages;

      E.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

      F.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: Bay Shore, New York
       December 20, 2018                 Respectfully submitted,

                                           FENLEY LLP

                                           */s/ Jason P. Fenley*
                                           Jason P. Fenley (JF4831)
                                           *Attorneys for Plaintiff*
                                           260 Montauk Highway, Suite #1
                                           Bay Shore, New York  11706
                                           (631) 894-1849